UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

FILED

2004 JAN 26  P 12: 45

U.S. DISTRICT COURT
HARTFORD, CT.

ROBERT T. PARKER,
-Plaintiff

v.                                              3:03-CV-930 (CFD)

HARTFORD PARKING AUTHORITY, et al.,
-Defendants


## MEMORANDUM AND ORDER

This case has been referred to the undersigned "to supervise discovery and resolve discovery disputes." (Dkt. 46)   Though the full extent of the dispute is not clear at present, it appears from defense counsel's January 23, 2004, letter to Judge Droney that complicated issues of attorney-client privilege, work product immunity, and waiver may well be percolating just beneath the surface of this case. (See Letter of Jill Hartley, Esquire)  These, of course, are among the more difficult and elusive discovery issues that one typically encounters in a civil suit.   Normally, these issues are decided on a question-by-question basis, and then only after counsel have first resorted to the mechanism specified in Local Rule 37, and provided the court with adequate briefs.

In an effort to provide counsel with guidance in their conduct of discovery in this case and possibly obviate the filing motions to compel (or motions for protective orders), the undersigned attaches hereto a copy of the court's ruling on a motion for sanctions in Utica Mutual Insurance Company v. Denwat, Civil No. 2:91 CV 135 (AVC)(December 15, 1992).  That decision contains several principles of law which counsel may find of assistance.

After counsel have reviewed that decision, they may contact the undersigned's chambers to schedule a discovery conference.

Dated at Hartford, Connecticut, this 2C Tᴴ day of January, 2004.

                                        Thomas   P.   Smith
                                        United States Magistrate Judge

2

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UTICA MUTUAL INSURANCE
COMPANY,
                    -Plaintiff


        -  v  -                          CIV.NO 2:91CV135(AVC)


DENWAT CORPORATION, ET AL,
                    -Defendants

## RULING ON MOTION FOR SANCTIONS

Utica Mutual Insurance Company ("Utica"), seeks sanctions against the defendants Denwat Corporation ("Denwat") and Minwax Company, Inc., ("Minwax"), alleging misconduct during discovery.  According to Utica, Minwax has engaged in a systematic pattern of discovery abuse involving, _inter alia_, obstructionist behavior at depositions, the intentional production of illegible documents, and the deliberate withholding of documents in violation of a court order. Because of the alarming nature of plaintiff's allegations, the undersigned held an evidentiary hearing October 13 through 16, 1992.  For the reasons that follow, Utica's motion is granted in part.

I.

Based on the evidence adduced at the hearing, it is clear that Minwax has engaged in unfair discovery

tactics which have prejudiced Utica, wasted the time of Utica's counsel, and unduly consumed the limited judicial resources of the court. The magistrate finds that Minwax's conduct is sanctionable.

## A. Misbehavior at Depositions

This action arises out of a fire that destroyed the Marlborough Country Barn in July, 1989. The fire is believed to have started with the spontaneous combustion of rags used to apply Watco Danish Oil Finish ("Watco") to some furniture at the Country Barn. Prior to 1988, a corporate predecessor of Denwat manufactured Watco. In December, 1988, Minwax acquired the predecessor's business and has continued to make Watco. As a result of the fire, Utica paid an $862,000 fire loss claim. Utica now seeks subrogation from the defendants.

Daniel Forestiere is Minwax's Research and Development Director. Given Utica's theory as to how the fire started, it is unsurprising that Utica would regard Mr. Forestiere as an important source of discoverable information. Utica attempted to take Mr. Forestiere's deposition beginning April 27, 1992, in Montvale, New Jersey. Utica was unsuccessful in completing the deposition, however, due to the disruptive behavior of Minwax's attorney, Michael J. Bonesteel, Esquire, which included repeated outbursts; the assertion of frivolous objections; the improper

2

privilege have no place in a deposition unless the examiner's questions are being asked to harass or embarrass the deponent, or the parties have stipulated otherwise. <u>Wright</u> v. <u>Firestone Tire & Rubber Co.</u>, 93 F.R.D. 491, 493 (W.D.Ky. 1982); Moore, <u>supra</u> ¶30.60 at 149 n.23.

Here, the questions posed by Utica's attorney were asked in good faith, and cannot reasonably be claimed to have been asked to annoy or embarrass Mr. Forestiere. Moreover, it appears that well before the Forestiere deposition, the parties had stipulated, as is the normal practice, that objections would be reserved until the time of trial. Nevertheless, the transcript of the Forestiere deposition is replete with objections by Minwax's counsel on such obviously inappropriate grounds, as "irrelevant", "argumentative", "speculative", "asked and answered", "overbroad", and "incoherent".

Often these unmeritorious objections were accompanied by disruptive outbursts, condescending lectures, snide remarks, and disparaging comments by Minwax's lawyer. The following few examples are illustrative.

> Q. Mr. Forestiere, I'm now going to get into some areas regarding the labels on the Danish Oil line just at the time of the buy-sell and subsequent to that time, just so you are focused.
> Before I get to the specific labels, I

4

would like to ask you some questions about
the product's potential harm to users.  The
first question is what are the principal ways
that WATCO Danish Oil can seriously injure a
user of the product?

MR. BONESTEEL:  Don't answer the question.
Counsel, I don't mind some when did you stop
beating your wife questions, and I have
allowed them, but that one reaches the area
of absurdity. I presume that a can could fall
out of an airplane and hit someone on the
head.  We do not need to be that inventive.
We'll answer your questions as they apply to
this case, as they apply to this product, but
let's not be that overbroad, shall we?

(Forestiere Tr. 505-508).

Q.  The term discard rubbish, if someone were
to otherwise follow the words in the clean-up
paragraph of PF-6 and discarded it in a
dumpster, that would be compliance with those
terms?

MR. BONESTEEL:  He already told you that it
wouldn't be compliance unless you followed
the label, Counsel.  He has told you that
three or four times. He has told you that
independently before when talking about each
of the labels.
    So, therefore, you are now into some
incomplete hypothetical, and if you want to
ask a hypothetical first, you pick one of the
two that I gave you, and are you still
talking about that hypothetical in which you
put these out on the grounds until they were
dry, as he has already described to you, so
that you follow the labeling procedures and
then dispose of them?  Because I can't tell
from what you're asking, and I'm sure you
wouldn't be trying to trick the witness.

MR. TENER:  Are you directing the witness not
to answer?

MR. BONESTEEL:  I am directing him not to
answer an incomplete hypothetical, yes.

(Forestiere 662-663).

Q.  Yes.  Let me rephrase it. Is it part of

5

your job, as you understand it, to become or
remain familiar with whatever technical
literature may exist regarding linseed oil
products?

A. It's part of my job to be familiar with
the ingredients that are contained in our
products.

Q. Is it encompassed within your job to know
the uses and possible adverse consequences of
linseed oil as used in consumer products? Is
that part of your responsibility?

MR. BONESTEEL:    You mean all the uses that
other people who make products having nothing
to do with this product line might put
linseed oil to?  Are you asking him -- is he
supposed to be the guru of linseed oil?

(Forestiere 653-654).

Q.   Are there any other safety standards,
either enacted by law or trade association
standards, that you understand as a corporate
policy Minwax seeks to conform to?

MR. BONESTEEL:    Pardon me?   What was that?
May I have that back?

(Previous question reread.)

MR. BONESTEEL: Don't answer that question.
It is vague, ambiguous, totally overbroad,
does not tend to lead to discovery of
admissible evidence. I'm sure that you can
reframe it to something having something to
do with this litigation, Counsel, and would
you please do so.  Jesus.

(Forestiere 647-648).  Additional examples of this type

riddle the Forestiere deposition transcript. (See e.g.,

pages 40-47, 66-67, 74, 79-80, 87-88, 100, 176, 183,

187, 194-195, 242-246, 250, 252, 311, 313, 356-357, 391-

392, 418-419, 421, 441-444, 465-467, 489, 504-508, 518,

551, 561, 584-588, 597-598, 618-619, 622, 648-650, 657,

666, 675-676, 679-682, 686-688, 700, 707, and 718).

The magistrate finds no merit in Minwax's argument
that Mr. Bonesteel's conduct "was consistent with the
decisions of numerous courts holding that it is proper
for counsel to instruct a witness not to answer
questions that are irrelevant, argumentative,
misleading, over broad, [or] speculative. . . ."
(Minwax's Memorandum at 24). The cases cited by Minwax
in support of this proposition are easily
distinguishable from the case at bar. Here, Minwax's
attorney repeatedly disrupted the deposition with
literally hundreds of baseless objections to questions
which were <u>not</u> unfair in any significant respect.
<u>Williams</u> v. <u>Thomas Jefferson Univ.</u>, 54 F.R.D. 615, 617
(E.D.Pa. 1972).

There was no harassment of the deponent in this
case as there was in <u>In re Carton Antitrust Litigation</u>,
83 F.R.D. 132, 134 (N.D. Ill. 1979)(examining attorneys
insistent "to the point of harassment"). Nor does this
case involve "limited instances" in which a deponent was
instructed not to anser, as was the case in <u>Lapenna</u> v.
<u>Upjohn Co.</u>, 110 F.R.D. 15, 19 (E.D.Pa. 1986), <u>quoting</u>
<u>Eggleston</u> v. <u>Chicago Journeymen Plumbers Local Union</u>,
657 F.2d 890, 902-03 (7th Cir. 1981). As was noted in
<u>In re Aircrash Disaster</u>, 130 F.R.D. 627, 629 (E.D. Mich.
1989), it is not the prerogative of an attorney to

7

decide whether a question is objectionable; rather, it is the court's function to make such decisions. <u>Shapiro</u> v. <u>Freeman</u>, <u>supra</u>.

The behavior at issue is not isolated or aberrational. It appears throughout the Forestiere deposition and warrants sanctions.

### 2.  Objections on Grounds of <u>Attorney-Client Privilege</u>

At several points throughout the Forestiere deposition, Minwax's lawyer directed the deponent not to answer questions on grounds of the attorney-client privilege. In light of the deposition transcripts and the remarks of Minwax's counsel at the evidentiary hearing, however, the magistrate finds that Minwax's privilege objections are based on a legally erroneous view of the law regarding the attorney-client privilege.

In the Second Circuit:

> Discovery serves important purposes, such as avoiding surprise, fully disclosing the nature and scope of the c o n t r o v e r s y ,   n a r r o w i n g , simplifying, and framing the issues involved, in enabling the parties to obtain the factual information needed to prepare for trial. Rules governing discovery should be interpreted broadly to achieve those purposes.

<u>Gary Plastic Packing Corp.</u> v. <u>Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 756 F.2d 230, 236 (2d Cir. 1985)(citation omitted).  By contrast, the rules

pertaining to privileges are <u>strictly</u> construed. "Inasmuch as testimonial exclusionary rules and privileges contravene the fundamental principle that the public has a right to every man's evidence, and such privilege must be strictly construed." <u>University of Pennsylvania</u> v. <u>EEOC</u>, 493 U.S. 182, 185 (1990). <u>Also see</u> <u>In re Horowitz</u>, 482 F.2d 72, 81 (2d Cir.), <u>cert.</u> <u>denied</u>, 414 U.S. 867 (1973).

Notably, "the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." <u>von Bulow by Auersperg</u> v. <u>von Bulow</u>, 811 F.2d 136, 144 (2d Cir.), <u>cert. denied</u> <u>sub non</u>., <u>Reynolds</u> v. <u>von Bulow</u>, 481 U.S. 1015 (1987). This burden is not discharged "by conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." <u>Id</u>. at 146.

The court must have a basis on which to weigh the applicability of a claim of privilege. <u>United States</u> v. <u>Davis</u>, 131 F.R.D. 391, 401 (S.D.N.Y. 1990). The responsibility for supplying that basis belongs to the party asserting the privilege. <u>International Paper Co</u>. v. <u>Fiberboard Corp</u>., 63 F.R.D. 88, 94 (D.Del.1974). It is not incumbent on the party seeking discovery to show that the claimed privilege is inapplicable.

Minwax has failed to sustain its burden of showing that the questions to which it objected on grounds of privilege truly did seek information falling within the attorney-client privilege.  In part, this failure is a function of an unreasonably self-serving and expansive conception of the law of privilege on the part of Minwax's counsel.

At oral argument, Minwax's counsel expressed the view that the scope of the protection which the attorney-client privilege accords to communications from an attorney to a client is the same as the protection it extends to communications from a client to attorney. Therefore, according to Minwax's lawyer, anything which he or co-counsel said to, or in the presence of, Minwax employees relating to this or any other litigation is a "privileged" communication.  In this, however, Minwax's counsel is incorrect.

The test Judge Wyzanaksi formulated in <u>United States</u> v. <u>United Shoe Machinery Corp.</u>, 89 F.Supp. 357, 358-359 (D.Mass. 1950), determines whether communications from a client to an attorney are privileged. However, as the late Judge Blumenfeld made clear, the protection accorded to communications from an attorney to a client is somewhat narrower.  <u>Clute</u> v. <u>Davenport Co.</u>, 118F.R.D. 312, 314 (D.Conn. 1988).  Such communications are privileged <u>only</u> to the extent that

10

their disclosure would reveal an underlying privileged communication from a client. Id. Also see SCM Corp. v. Xerox Corp., 70 F.R.D. 508, 522 (D.Conn.)(Newman,J.) ("unless their legal advice reveals what the client has said, no legitimate interest of the client is impaired by disclosing the advice.") appeal dismissed, 534 F.2d 1032 (2d Cir. 1976).

The magistrate finds that Minwax's claim of attorney-client privilege has been asserted indiscriminately and in circumstances where the privilege may be inapplicable as a matter of law. Through no fault of Utica, one cannot readily determine from an examination of the record whether an assertedly privileged communication is from client to attorney, or from attorney to client. In these circumstances, it is plain that Minwax has failed in its burden of establishing privilege.

Minwax's erroneous view of the law of privilege is not the only thing which frustrated Utica's taking of the Forestiere deposition. In many instances it appears, quite remarkably, that Minwax's attorney invoked the attorney-client privilege because Utica had failed to demonstrate to Minwax's satisfaction that the privilege was not applicable. The following illustrates Minwax's erroneous shifting of its burden to Utica's shoulders:

11

Q. Specifically, what do you mean
by posed by EPA regulations?

MR. BONESTEEL:    I have an
objection, I think, to the line of
questioning here in that I cannot
tell if this is an area of
privileged communication between an
attorney and client, and further
inquiry in it might invade the
ability of Mr. Forestiere to
communicate with his lawyer in this
direction and Mr. Sessa, to whom he
is directly referring here,
Counsel, and I believe that an
attorney/client communication, if
intended to be that, would be
privileged in this instance.

MR. TENER:    Are you directing the
witness not to answer?

MR. BONESTEEL: Yes. Yes, I am, but
only because I just don't know if
I'm invading in this area, and I
would be happy to have you lay some
preliminaries on it, and if it's not
an invasion of it, I would be happy
to let the witness answer, but I
just don't think I'm at liberty to
do so at this moment.

(Forestiere 476-477; emphasis added).    This occurred
repeatedly throughout the deposition.

The transcript of the Forestiere deposition also
reveals many instances where Minwax's counsel (1) issued
overbroad, blanket instructions silencing Mr. Forestiere
completely even if only a portion of his answer may have
revealed a privileged communication, or (2) prematurely
invoked the attorney-client privilege if questions
merely had the "potential" of revealing privileged
communications.    In neither instance are Minwax's

12

actions justified.

As previously noted, the burden of <u>establishing</u> the existence of privilege is on the person or party asserting it. <u>von Bulow</u>, <u>supra</u>, 811 F.2d at 144. Where it is <u>clear</u> that a deposition question <u>would</u> elicit information that is protected from discovery by the attorney-client privilege or the work product doctrine, it is appropriate to object and, if necessary, to instruct the deponent <u>not to reveal such information in his or her answer</u>. 4A J. Moore, <u>supra</u> ¶30.59 at 145. However, it is <u>not</u> appropriate to instruct a deponent to stand mute, and to provide no answer at all, simply because a portion of an answer might properly be shielded from discovery. Just as a party has an obligation to provide redacted documents in response to a Rule 34 request, a deponent must answer a deposition question to whatever extent it calls for discoverable information.

Similarly, where a question merely has the "<u>potential</u>" of eliciting a non-discoverable response, it is not appropriate to instruct a deponent to be silent. Short of seeking relief from the court, all that deponent's attorney may safely do in such circumstances is instruct the deponent to be vigilant not to reveal privileged communications or protected information in his or her answer.

that Minwax's objections on grounds of attorney-client privilege are unmeritorious, and that its broadsword instructions to the witness were improper.

### 3.  Improper Coaching or Answering for the Deponent

Utica next contends that Minwax's attorney also repeatedly coached Mr. Forestiere, and occasionally even answered questions that were directed to Forestiere. An examination of the deposition transcript fully supports Utica's contention.  The following excerpts again illustrate Minwax's lawyer in action:

> Q:  And which ones would have been decreased?
>
> MR. BONESTEEL:  All of them.
>
> A.  Yes, all of them, I believe.

(Forestiere 108)

> Q.  What does that mean, by the way?   What does antisettling characteristics means?
>
> MR.  BONESTEEL:      It  won't precipitate out.
>
> A:  Not precipitate.  The pigment dispersions are finally divided dispersed solids and when incorporated into a low viscosity product, such as the Watco Danish Oil Finish, gravity will tend to move them to the bottom of the container over time and if the product is not properly formulated, that settling can be hard, making it difficult to redisperse the pigments.  So small amounts of additives are routinely used to make . . . .

15

(Forestiere 121-122)

> Q: This involved, am I correct, testing for improved products, among other things, improvements in products?
>
> MR. BONESTEEL: Counsel, it involved, he said it to you before, doing specific things at the request of counsel. You can try and torture the evidence until it confesses but frankly, it doesn't change the facts.

(Forestiere 184). Also see, e.g., pages 194-195, 251-252, 311, 318, 442-443, and 454.

Utica's attorney was entitled to test Mr. Forestiere's powers of perception, recollection, and narration, as well as his credibility, without Minwax's lawyer blurting out suggested answers, offering gratuitous groans of disdain and exasperation, and attempting to recast the question which had been asked.

There was no likelihood of Forestiere's being confused or misled by the questions that were posed by Utica's lawyer, nor is there any basis at all for suggesting that Minwax's lawyer was compelled to intervene in the "interests of justice". The foregoing objections served no purpose but to disrupt the deposition and frustrate the good faith efforts of Utica's lawyer to conduct the discovery to which he was entitled under the law. The magistrate finds, once again, that Minwax's actions are clearly inappropriate.

16