### 4. Objections to Questions Concerning Documents Which Already Had Been Produced

An examination of the Forestiere deposition transcript also reveals many instances in which Minwax's attorneys forbade Utica from asking questions about documents that Minwax already had produced. Frequently, Minwax's objections were based on the attorney-client privilege and the work product doctrine. The following is one example from among the many cited by Utica.

Q: Looking at exhibit 14, can you tell me what - do you see the phrase, or the letter AOF in about the fourth line down under "18 rag raise," do you see those letters?

A: Yes.

Q: What does that mean?

MR. BONESTEEL: Don't answer the question. Same objection, same instruction. I think it has already been asked and the same instruction given.

Q: Right above that, it says 266B. Do you see that?

A: 2663.

Q: I'm sorry. What does that refer to?

MR. BONESTEEL: Same instruction, same objection.

Q: Looking down right beneath the confidential stamp, do you see that, DOF?

A: Yes.

Q: What does DOF stand for?

17

> MR. BONESTEEL:    Same instruction,
> same objection.
>
> Q:  And beneath that, DOF (405),
> what does that stand for?
>
> MR. BONESTEEL:  Same instruction.
>
> Q: Looking to the right, where it
> says STT, what does STT stand for?
>
> MR. BONESTEEL:  Counsel, I'm going
> to instruct him not to answer any
> questions about that whole section.
> We can save ourselves some time.

(Forestiere at 178-180).  Minwax's invocations of the attorney-client privilege, and the accompanying instructions that the witness not answer, are inappropriate for the reasons previously discussed. Similarly, the work product doctrine does not justify Minwax's actions for the reasons discussed hereafter. Moreover, the magistrate finds that Minwax has failed to offer any sound or persuasive reason why its production of these documents to Utica should not be held to operate as a waiver of any claims of privilege with respect to the subject matter of those documents.

It appears that Utica also was prevented from asking questions about these documents solely on grounds of relevancy and materiality.  The following exchange between Utica's counsel and another of Minwax's lawyers, Robert L. Kaufman, Esquire, regarding Exhibit 17, illustrate these objections.

> Q:  17.  My question is did any of
> those other products other than the

Watco, which you have already testified about, have a tendency to self-heat?

MR. KAUFMAN: I'm going to object to that as being irrelevant. It has nothing to do with the litigation. He is not going to answer that.

MR. TENER: On a claim of what?

MR. KAUFMAN: It's completely irrelevant, not reasonably calculated to lead to the discovery of admissible evidence.

Q: Were you comparing as part of your testing in considering a reformulation the self-heating tendencies of these four Minwax products in connection with exhibit 17?

MR. TENER: Let the record reflect that counsel, Mr. Kaufman, is now conferring with the witness.

MR. KAUFMAN: The record can reflect anything you like, counsel. I have a right to talk to my client and I will do it whenever I wish.

Q: Can you answer the question now?

A: Test results were generated for a variety of products.

Q: Were they generated for these four products identified on, these four product lines identified on exhibit 17?

MR. KAUFMAN: All four of them?

MR. TENER: Yes.

MR. KAUFMAN: He is not going to answer with respect to the other three I already objected to because it's completely irrelevant to this

19

proceeding and it's not reasonably calculated to lead to the discovery of admissible evidence.  If you want to ask him whether he did test results on Watco, go ahead.

MR.  TENER:    Counselor,  will anything I say on the relevancy issue matter to you?

MR. KAUFMAN: I'm always willing to listen.

MR.  TENER:   It  could  lead  to admissible evidence insofar as they have  labeling  and  other  people trained in labeling, it could have a lot to do with the way they conduct  their  overall  product safety program.

MR.  KAUFMAN:   I'm not convinced, counsel.

(Forestiere at 226-227). The magistrate finds that the foregoing objections by Mr. Kaufman and his instructions to the witness were inappropriate.

### 5.  Objections Based on the Work Product Doctrine

Minwax has suggested that even if its conception of the law regarding the attorney-client privilege were erroneous, its deposition objections are nonetheless meritorious because each time it objected on privilege grounds, it also objected on grounds of work product immunity. Thus, Minwax submits, it is on solid ground, since each objection at least has one valid basis. Once again, however, the magistrate must disagree with Minwax.

20

Most of the observations made in the preceding section with respect to the attorney-client privilege apply with equal force here. Most notably, it is Minwax's burden of establishing that the work product doctrine is applicable in each given instance where it is relied on to forestall discovery; it is <u>not</u> Utica's burden to show that the doctrine is inapplicable. <u>E.g.</u>, <u>Hodges, Grant & Kaufman</u> v. <u>U. S. Government</u>, 768 F.2d 719, 721 (5th Cir. 1985). Based on the record before the court, the magistrate finds not only that Minwax has failed in its burden but that, paradoxically, in its zeal to circumscribe Utica's discovery, Minwax has sabotaged its own record.

The work product doctrine provides a <u>qualified</u> immunity from discovery to work performed by, or at the direction of an attorney in anticipation of litigation. <u>Hickman</u> v. <u>Taylor</u>, 329 U.S. 495 (1947); Fed.R.Civ.P. Rule 26(b)(3). The doctrine does not protect documents and materials which are made in the ordinary course of business. <u>Hardy</u> v. <u>New York</u>, 114 F.2d 633 (S.D.N.Y. 1987). Moreover, if a document that was prepared "in anticipation of litigation" would have been created anyway in the normal course of business, the work product doctrine does not apply. <u>Kelly</u> v. <u>City of San Jose</u>, 114 F.R.D. 653, 659 (N.D. Cal. 1987).

Thus, ordinary business information may <u>not</u> be

21

channeled through the hands of legal counsel so as to disguise its true commercial character and simultaneously clothe it with protection under the work product doctrine. "[L]egal departments are not," as Judge Newman has observed, "citadels in which . . . business or technical information may be placed to defeat discovery. . . ." SCM Corp. v. Xerox Corp., supra 70 F.R.D. at 515. The distinction between business information and information generated or developed "in anticipation of litigation" is, therefore, highly relevant, if not critical, in determining whether the work product doctrine is applicable.

Despite this, an examination of the deposition transcripts reveals that Minwax repeatedly forbade the answering of foundation questions that Utica was clearly entitled to ask in order to probe the extent, if any, of the factual basis for Minwax's claim of work product immunity. These include questions aimed at determining what, if any, commercial use may have been made of the results of testing that, according to Minwax, was undertaken at the direction of Mr. Bonesteel's law firm, in anticipation of this and other litigation. Indeed, by instructing the witness not to answer, and by boldly declaring their intent to persist in their instructions, as a practical matter, Minwax's lawyers forbade even the asking of other pertinent questions.

22

As Utica correctly points out, the position which Minwax's counsel have taken at the depositions is especially troubling because it appears rather clearly that Minwax has delegated to Mr. Bonesteel's law firm activities and responsibilities with regard to product testing, research, and development that traditionally are purely commercial in character.

Most particularly, with regard to spontaneous combustion testing, Minwax maintains that <u>all</u> testing has been undertaken at the direction of the Bonesteel law firm and, therefore, is immune from discovery as "work product."  In addition, Minwax has taken the unrealistically sweeping position that "<u>every iota</u> of factual knowledge that <u>any</u> Minwax employee possesses regarding Watco's propensity to spontaneously combust" also is work product.  (Utica's Memorandum at 10; Forestiere at 380).

Despite being unfairly restrained, Utica has nonetheless managed to unearth evidence that the results of some  spontaneous combustion tests were entered into Minwax's Research and Development log, a general compendium made and maintained in the ordinary course of Minwax's business.  Furthermore, Utica has obtained evidence that some of these tests have involved reformulations of the Watco product. Understandably, in the circumstances, Utica suspects that the tests may

23

have been for non-litigative purposes.

Although Minwax initially argued that none of these tests had a business purpose, and that none had been put to a non-litigative, commercial use, shortly _after_ the evidentiary hearing on the pending motion, Minwax's counsel informed the undersigned by letter that, in fact, Minwax _has_ used at least one reformulation in the development of a new product, and that the results of the testing in question also _have_ been taken into account in the development of this new product. See October 27, 1992, letter of Michael J. Bonesteel, Esquire.

Minwax tries to minimize the significance of this tardy revelation. But the circumstances surrounding it raise serious questions about the veracity of Minwax's other representations to Utica and to the court. Having time and again denied Utica an opportunity to probe into whether there had been a non-protected business use of the tests, and having repeatedly sworn at the hearing that there was no such "hybrid" use, Minwax's post-hearing disclosure that there really _was_ such a use adds considerable weight to Utica's allegation of bad faith. In any event, in the circumstances, it would be irresponsible for the court to accept Minwax's self-serving description of its non-protected use as being only an "incidental business use." There is no question

24

that Minwax has failed to sustain its burden of showing that the work product doctrine applies.

Because the magistrate finds that Minwax has failed to sustain its burden, there is no need to dwell on the numerous legal deficiencies that Utica perceives in Minwax's position. In brief, however, Utica aptly suggests that Minwax (as a presumably responsible company which ought to be concerned with the lives and safety of its customers) conducted spontaneous combustion tests in response to the conflagrations themselves, and not primarily to aid litigation that may have been anticipated to arise from the fires. In other words, Utica submits, and on this record the magistrate finds, that Minwax would have conducted these spontaneous combustion tests even if there had been no threat of litigation.

There is, of course, a significant difference between materials "prepared in response to an unfortunate event that might well lead to litigation, and materials prepared as an aid to litigation." Scott Paper Co. v. Ceilcote Co., Inc., 103 F.R.D. 591, 595 (D.Mass. 1984)(emphasis original). The latter are protected by the work product doctrine; the former are not. Material which is assertedly prepared in anticipation of litigation, but which would have been prepared anyway in the normal course of business, is not

25

protected by the work product doctrine. <u>Kelly</u> v. <u>City of San Jose</u>, 114 F.2d 653, 659 (N.D.Cal. 1987). The spontaneous combustion tests at issue here fall into this unprotected category. Minwax's invocation of the work product doctrine to block questioning about them is improper.

Minwax does not deny that it <u>would</u> <u>have</u> <u>conducted</u> these spontaneous combustion tests in any event. Rather, Minwax states that "it never had the opportunity" to conduct such tests "in the ordinary course of business." Minwax's Opposition Memorandum at 21. This is not inconsistent with the magistrate's finding that the spontaneous combustion tests were carried out in response to the conflagrations.

Minwax is, therefore, ordered to produce the results of any and all spontaneous combustion testing which has been, or is being, done on the Watco product at issue in this suit.

### B. Deliberate Production of Illegible Documents

On December 19, 1991, Judge Clarie ordered Minwax to comply with certain of Utica's Interrogatories and Document Requests (Exhibit 10). In response, Minwax began to produce documents. In innumerable instances, however, the documents that Minwax produced were photocopies of such poor quality that they were virtually illegible and useless. Upon receiving these

useless documents, Utica had no choice but to write to Minwax to complain about the documents' illegibility and to request that readable copies be provided.

Thus began a slow and costly process by which Utica -- the party <u>entitled</u> to documents by virtue of an <u>order</u> entered by a United States District Judge after a <u>hearing</u> -- was forced by Minwax to engage in a letter writing campaign to convince Minwax to do what it was <u>obligated</u> to do all along. Eventually, legible copies were provided by Minwax, but on its own timetable and not until Minwax had first put Utica "through the hoops". <u>See</u> Local Rule 9(e)1, requiring compliance within ten (10) days of the Court's order.

This issue was addressed at the evidentiary hearing. On the basis of the evidence developed at that hearing, and upon the record as a whole, the magistrate finds that Minwax deliberately supplied Utica with illegible copies. It did so as part of the "hardball" strategy that it has employed at every turn in this case. That Minwax eventually produced legible copies does not exonerate it, but merely underscores that Minwax had it within its power to produce legible copies at the outset. Instead, Minwax deliberately chose to engage in conduct calculated to increase Utica's litigation expenses, to distract Utica's counsel, to deprive Utica of the benefit of Judge Clarie's ruling,

27

and to derail discovery in this case.  In all of these things, Minwax has succeeded.  In the process, it also has prejudiced Utica.

C.    Deliberate Suppression of Report of Consumer
Product Safety Commission Investigation of Texas Fire

In his ruling filed December 20, 1991, Judge Clarie ordered that "Minwax shall disclose forthwith all complaints, claims and/or lawsuits during the past five years to the present date, in which it is claimed that the Watco-Danish Oil Finish, as a product of Minwax, was a cause of said claims, without regard to whether the claims may have arisen after the incident complained of in the present pending action."   (Exhibit 10 at 2; emphasis added).

On September 28, 1992, after the undersigned magistrate set the pending motion down for a hearing, Utica's counsel received a letter from Minwax's attorney along with a copy of a September, 1990, U. S. Consumer Product Safety Commission "Consumer Product Incident Report" wherein a Texas consumer had complained that rags used to apply Minwax's Watco product had spontaneously combusted, causing damage to his home.

The letter by which Minwax transmitted this document to Utica states:

> Although not required to be produced by the Court's December 20, 1991 order we are enclosing a copy of the Consumer Product Safety Commission correspondence and incident report relative to the Texas incident

28

described in Mr. Forestiere's deposition. Inasmuch as the CPSC materials are public information, and Mr. Pongrass permitted his name to be released to the public, <u>we expect that you probably had these materials long before you took the deposition of Mr. Forestiere</u>.

We also are enclosing a copy of a L&F Product Investigation Report relative to a telephone call from Mr. Pongrass, of which we recently became aware. <u>Although we do not believe that this document literally falls within the scope of the Court's December 20, 1991 ruling, we are producing a copy of the same in the spirit of cooperation</u>. Please note that we have redacted those portions of the document reflecting attorney/client communications. Mr. Sessa was the attorney involved in those communications.

(Exhibit 22; emphasis added).  The magistrate agrees with Utica's characterization of the foregoing as "disingenuous".

The evidence in this case establishes, and the magistrate finds, the following facts.  Production of the September, 1990, incident report clearly <u>was required</u> by the court's December 20, 1991, order. By the terms of Judge Claric's order, Minwax was required to produce the document "forthwith".  Minwax knew of the existence of this incident report by November, 1990, and had investigated it internally by March 15, 1991 (Exhibit 22).  Nevertheless, Minwax did not produce the document until late September, 1992, <u>after</u> it learned that a hearing had been set down on the pending motion.

Minwax's statement, "Although not required to be produced by the Court's December 20, 1991 order", is

29

both self-serving and wrong, as Minwax well knows.  The
statement  is  an  attempt  to  camouflage  Minwax's
withholding  of  this  document  in  violation  of  Judge
Clarie's order.  In view of Minwax's actions to date, it
is not credible to suggest, as Minwax now attempts to
do,  that  it  produced  the  document  in  a  "spirit  of
cooperation" or out of respect for Judge Clarie's order.

That Minwax finally produced the document tardily
is not evidence of good faith, but is additional proof
that Minwax knew all along that the document was within
the  scope  of  Judge  Clarie's  order.    Similarly,  any
suggestion that Minwax's withholding of the Consumer
Product Safety Commission document was inadvertent is
not supported by the facts.

### D.  Miscellaneous

This opinion does not purport to address each and
every  instance  of  misbehavior  about  which  Utica
justifiably  complains.  Thus,  the  failure  of  the
magistrate to discuss a particular contention by Utica
should  not  be  interpreted  as  a  rejection  of  that
contention. The issue is whether Minwax's conduct is
sanctionable and, if so, what sanction or sanctions are
appropriate,  not  whether  there  are  arguments  left
unaddressed by the magistrate. Surely there must be some
limit on the judicial time and resources that a litigant
like  Minwax  is  allowed  to  monopolize.    Though  not

necessarily discussed herein, each of Minwax's arguments has been considered, yet none changes the conclusion that is commanded by the facts:    Minwax's conduct demands severe sanctions.

II.

A variety of sanctions are sought by Utica. Some are within the magistrate's statutory power to impose, while others are not. Each category of sanctions is considered separately.

A.

Utica seeks the entry of a judgment against Minwax on the issue of liability, and the assignment of this case for a prompt trial on damages. This, of course, is a "case dispositive" sanction which the magistrate lacks the authority to impose under Fed.R.Civ.P. 37(b). Thomas E. Hoar, Inc. v. Sara Lee Corp., 900 F.2d 522, 525 (2d Cir. 1990).

The authority of a district judge to impose such a drastic sanction under Fed.R.Civ.P. Rule 37(b) appears clear, however.    E.g., Paine Webber v. Inmobiliaria Melia de Puerto Rico, Inc., 543 F.2d 3, 6 (2d Cir. 1976); Marshall v. F.W. Woolworth, Inc., 122 F.R.D. 117, 119 (D.P.R. 1988); Pauley v. United Operating Co., 606 F.Supp. 520, 525-26 (E.D.Mich. 1985); Kozlowski v. Sears Roebuck & Co., 73 F.R.D. 73, 77 (D.Mass. 1976).    Another basis for the imposition of such a severe sanction is

31

the court's inherent authority to control its own docket.  Landis v. North American Co., 299 U.S. 248, 254-55 (1938).  The only real issue is whether the imposition of so radical a sanction is warranted.

Minwax has violated Judge Clarie's December 20, 1991, discovery order by initially producing illegible documents.  It also violated that order by suppressing the Consumer Product Safety Commission document, which it ultimately produced tardily and only after this court had scheduled a hearing on the pending motion.

These violations alone are serious enough to permit entry of judgment against Minwax.  Altschuler v. Samsonite Co., 109 F.R.D. 353, 356 (E.D.N.Y. 1986).  When they are considered in conjunction with Minwax's behavior during the depositions, however, the argument in favor of entering a judgment against Minwax is even stronger.  Surely, one cannot sincerely contend that Minwax's behavior is not sufficiently egregious for the imposition of such a sanction. Id. at 356-57.  Nor can one minimize the congestive effect that such behavior has on the court's docket.

If only a tiny fraction of the parties to the cases pending in this district were to emulate Minwax, civil justice would be paralyzed.  Unless Minwax's actions receive appropriately severe sanctions, law abiding parties will lose what remaining confidence they have in

32

the courts and will themselves resort to such lawless behavior as a matter of self-defense.

As a result of Minwax's actions, Utica has been prejudiced. It has lost forever the opportunity to take discovery from Dr. John Domanski, Minwax's Director of Toxicology. According to the parties' representations, Dr. Domanski is no longer available to be deposed, as he has become seriously ill. While Minwax trivializes Domanski's importance as a witness by arguing that his field is <u>toxicology</u>, not combustibility, the argument is unmeritorious. That toxicology is Domanski's field does not mean that he and Forestiere discussed <u>only</u> toxicology, or that Domanski's testimony is unimportant.

Utica had a right to question Domanski about <u>his</u> recollection of discussions that he had with Forestiere. Utica, likewise, had a right to probe Domanski's views as to the relationship <u>vel non</u> between self-heating and toxicity. Minwax cannot force Utica to accept Forestiere's version of the facts by preventing Utica from taking the depositions of witnesses whose recollection may conflict with Forestiere's. Yet, the practical effect of Minwax's dilatory behavior, and its inappropriate silencing of Forestiere during his deposition, is precisely that.

Reprehensible though Minwax's conduct has been, however, it is unclear to the magistrate that less

33

drastic sanctions would not achieve the sought after deterrent effect, as well as provide Utica with the relief it genuinely deserves.  The law seems clear that dismissal or entry of judgment may be imposed as a Rule 37(b) sanction only as a last resort.  Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1556 (11th Cir.), cert. denied, 107 S.Ct.274 (1986).

While the actual imposition of less drastic sanctions is not a prerequisite to the entry of judgment, United States v. DiMucci, 879 F.2d 1488, 1493 (7th Cir. 1989), where the record fails to establish the inadequacy of lesser sanctions, an order imposing the drastic sanction of dismissal or judgment is an abuse of discretion.  United States for Use of Wiltec Guam, Inc. v. Kahaluu Constr. Co., Inc., 857 F.2d 600, 603 (9th Cir. 1988).  Thus, on the instant record, the magistrate declines to recommend the entry of a judgment against Minwax.

Decision is reserved on that portion of Utica's motion which seeks entry of a judgment against Minwax. Should it later become apparent that the lesser sanctions hereafter imposed are inadequate, or otherwise fail, to deter Minwax from violating the court's discovery orders, the more severe sanction of entry of judgment may well be imposed.  Likewise, should the court conclude at the completion of discovery that the

34

prejudice to Utica from being unable to depose Dr. Domanski cannot be cured, it may be appropriate to impose additional sanctions at that time.

B.

Utica also seeks a number of sanctions which the magistrate is authorized by statute to impose. A decision awarding such "non-dispositive" sanctions is reviewable pursuant to the "abuse of discretion" standard. <u>Thomas E. Hoar, Inc.</u>, <u>supra</u>; <u>Ocelot Oil Corp.</u> v. <u>Sparrow Industries</u>, 847 F.2d 1458, 1465 (10th Cir. 1988). <u>Also</u> <u>see</u>, 7 Pt. 2 J. Moore, <u>Federal Practice</u> ¶72.03 (1992).

1.   Attorneys' Fees and Costs
   in Prosecuting This Motion

The record clearly establishes Utica's entitlement to attorneys' fees in connection with its preparation for, and successful prosecution of, this motion. Utica has established that Minwax's counsel sabotaged the Forestiere deposition by scores of frivolous objections and other obstreperous conduct described previously in this opinion. Utica is entitled to an award of attorneys' fees and costs incurred in securing a judicial determination that: (1) Minwax's objections are unmeritorious; (2) the instructions given to Mr. Forestiere were unjustified; (3) the behavior of Minwax's attorney, Mr. Bonesteel, was unfairly disruptive, and; (4) Utica is entitled to redepose Mr.

35

deposition that are salvageable by Utica, Minwax is in no position to assert that either Utica or the court is obligated to sift through the transcript in search of such testimony. The magistrate finds that Minwax's misconduct necessitates that Mr. Forestiere be redeposed.

Because Minwax's behavior protracted the failed Forestiere deposition, as well as reduced its value to virtually nothing, Minwax shall reimburse Utica for the reasonable attorneys' fees, costs, and expenses which Utica incurred in preparing for, and attempting to take Mr. Forestiere's deposition in Montvale, New Jersey. Mr. Forestiere's redeposition will commence at a time and place to be agreed on by counsel.

### 3.  Compensation for the Economic Consequences To Utica of Minwax's Violations of the Court Order

Simply awarding Utica its attorneys' fees and costs in bringing this motion is not enough. Rule 37(b)(2) contemplates an appropriate sanction in addition to an award of fees. While it is difficult to determine at this point the full effect that Minwax's violation of Judge Clarie's order has had on Utica, at a minimum Utica is entitled to the reasonable attorneys' fees and expenses it incurred in securing the legible copies that should have produced at the outset. Utica also is entitled to the reasonable attorneys' fees and expenses that it incurred as a result of Minwax's suppression of

37

Forestiere in order to get answers to its deposition questions.   Surely Minwax does not contend that the court is powerless to award Utica attorney's fees due to Utica's not moving first under Rule 37(a), or otherwise specifying that an order compelling answers is also sought.  To the magistrate such a request is implicit in the relief that Utica has requested in its motion for sanctions.

Utica also is entitled to attorneys' fees and costs in connection with its successfully establishing that Minwax deliberately violated Judge Clarie's order directing Minwax to produce documents. Having presided at the lengthy evidentiary hearing, the magistrate finds that Minwax's conduct at the deposition is relevant in determining whether its violation of Judge Clarie's order was inadvertent, and in weighing the credibility of Minwax's version of what occurred.   Thus, Utica's fees and expenses in preparing for and presenting that aspect of this motion which deals with misconduct at the deposition is also properly the subject of an award under Rule 37(b)(2).

> 2. Reimbursement of Fees, Costs, and
>    Expenses Incurred in Preparing
>    For and Taking the Forestiere Deposition

The magistrate finds that Minwax's misbehavior was so pervasive that it renders the Forestiere deposition virtually useless. While there may be portions of the

36

the report of the Texas incident.

### 4.  Further Depositions

Utica's request that all further depositions be conducted in Connecticut or in the presence of a judicial officer is understandable, but is denied. All further discovery will proceed in strict accordance with the Federal Rules of Civil Procedure. Minwax is ordered to comply with the Federal Rules of Civil Procedure, and to desist the practices described herein. Further instances of discovery abuse will not be tolerated and may be punished by drastic sanctions.

To the extent Utica seeks a modification of the protective order entered by Judge Clarie, the motion is treated in a separate ruling and is denied without prejudice. Utica may not claim attorney's fees and costs related to its prosecution of this narrow aspect of its motion.  Nor is Minwax entitled to fees and costs in opposing this aspect of the pending motion.

### 5.

Utica shall file forthwith appropriate affidavits to support its application for attorneys' fees, costs, and expenses.  The papers will clearly specify _inter alia_ the particular portion of this ruling on which the claim is based, the identity of the attorneys performing the work, the number of hours claimed by each, the hourly rate claimed by each, the grand total of

attorneys' fees claimed, and an itemization of reasonable travel, food, and lodging expenses. Utica shall file all of the aforesaid papers on the same date.

Within thirty (30) days thereafter, Minwax shall file appropriate papers challenging the reasonableness of the number of hours of claimed, hourly rate billed, or any other aspect of the claim by Utica's counsel.

III.

This is a discovery ruling and order. Either side is free to timely seek review by an Article III Judge as provided by statute, 28 U.S.C. §636, Rule 72, F.R.Civ.P., and Local Rules for U. S. Magistrate Judges. The failure to do so may preclude further review. The filing of an application for review does not stay this order.

Dated at Hartford, Connecticut, this 15th day of December, 1992.

**THOMAS P. SMITH**
**U. S. MAGISTRATE JUDGE**

39